NEWMAN, Circuit Judge,
dissenting.
Today’s culture, as well as today’s economy, are founded on advances in science and technology. As the Industrial Revolution advanced, and recognizing the importance to the nation of technology-based industry, the Tariff Acts of 1922 and 1930 were enacted to provide additional support to domestic industries that dealt in new and creative commerce, by providing an efficient safeguard against unfair competition by imports that infringe United States patents or copyrights. The International Trade Commission correctly applied the Tariff Act and precedent to encompass today’s forms of infringing technology..
The new technologies of the Information Age focus on computer-implemented methods and systems, whose applications of digital science provide benefits and conveniences not imagined in 1922 and 1930. Throughout this evolution, Section 337 served its statutory purpose of facilitating remedy against unfair competition, by providing for exclusion of imports that infringe United States intellectual property rights.
Until today.
The court today removes Section 337 protection from importations that are conducted by electronic transmission. The court’s reason is that electronically transmitted subject matter is not “tangible,” and that only tangible imports are subject to exclusion. This holding is contrary to Section 337, and conflicts with rulings of the Supreme Court, the Federal Circuit, the Court of Customs and Patent Appeals, the Court of International Trade, the International Trade Commission, the Customs authorities, and the Department of Labor. I respectfully dissent.

Infringement is not here at issue; the only issue is the Section 337 cease and desist order.

The imports are-infringing “digital models, digital data, and treatment plans for use in making incremental dental positioning adjustment appliances,” produced for ClearCorrect in Pakistan and imported into the United States by electronic transmission. The International Trade Commission found, and it is not disputed, that the imported data sets are “virtual three-dimensional models” of a patient’s teeth, and that the imports are used in the United States to make a three-dimensional physical model of the dental appliance. Certain Digital Models, Digital Data, & Treatment Plans for Use in Making Incremental Dental Positioning Adjustment Appliances, the Appliances Made Therefrom, & Methods of Making the Same, Inv. No. 337-TA-833, at 17 (April 10, 2014) (“Comm’n Op.”).
Infringement of the Align Technology patents is not at issue. The only issue is whether the Section 337 remedy is available to exclude the infringing digital subject matter. The Commission, reviewing the “plain language of the statute, its legislative history and purpose, pertinent case law, and the arguments of the parties and public commenters,” held that “the digital data sets at issue ... are true articles of international commerce that are imported into the United States, and their inclusion within the purview of section 337 would *1305 effectuate the central purpose of the statute.” Comm’n Op. at 55.
The Commission issued a Cease and Desist Order against “importing (including through electronic transmission)” the digital models, digital data, and orthodontic plans that were found to infringe the Align patents. Order (April 3, 2014). The panel majority now revokes that Order, holding that imports reaching the United States by electronic transmission are not subject to Section 337. This ruling is contrary to the statute and contrary to precedent; and if there were there doubt as to the intended scope of Section 337, the Commission’s ruling requires deference.

The Commission correctly held that section 337 applies to imports of infringing digital goods.

Section 337 of the Tariff Act of 1930, as amended, makes unlawful:
(B) The importation into the United States, the sale for importation, or the sale within the United States after importation ... of articles that—
(i) infringe a valid and enforceable United States patent or ... copyright. ...; or
(ii) are made, produced, processed, or mined under, or by means of, a process covered by the claims of a valid and enforceable United States patent.
19 U.S.C. § 1337(a)(l)(B)(i)-(ii).
The Commission determined that ClearCorrect’s infringement of the Align patents in the United States, and infringement by the process practiced for Clear Correct in Pakistan, is subject to Section 337. The court’s rejection of that ruling is in contravention of the text and the purpose of Section 337 of the Tariff Act.
Section 337 was enacted to facilitate the protection of American industry against unfair competition by infringing imports. The statute was designed to reach “every type and form” of unfair competition arising from importation. The Senate Report stated: “The provision relating to unfair methods of competition in the importation of goods is broad enough to prevent every type and form of unfair practice and is, therefore, a more adequate protection to American industry than any antidumping statute the country has ever had.” S.Rep. No. 67-595 at 3 (1922).
Our predecessor Court of Customs and Patent Appeals emphasized that this purpose is “to give to industries of the United States, not only the benefit of the favorable laws and conditions to be found in this country, but also to protect such industries from being unfairly deprived of the advantage of the same and permit them to grow and develop.” Frischer & Co. v. Bakelite Corp., 17 CCPA 494, 39 F.2d 247, 259 (1930).
Until today,' this Tariff Act provision has been interpreted to implement this protective incentive. In In re Northern Pigment Co., 22 CCPA 166, 71 F.2d 447 (1934), the court applied Section 337 to reach products produced abroad by a process patented in the United States, stating that “if unfair methods of competition or unfair acts in the importation of articles into the United States are being practiced or performed by any one, they are to be regarded as unlawful, and the section was intended to prevent them.” Id. at 455. This ruling is codified at Section 1337(a)(l)(B)(ii), supra.
Over the decades, the International Trade Commission and the Court of Customs and Patent Appeals implemented Section 337 “to provide an adequate remedy for domestic industries against unfair methods of competition and unfair acts initiated by foreign concerns operating be *1306 .yond the in personam jurisdiction of domestic courts.” Sealed Air Corp. v. Int’l Trade Comm’n, 68 CCPA 93, 645 F.2d 976, 985 (1981). The Federal Circuit reiterated this purpose, stating in Lannom Mfg. Co. v. Int’l Trade Comm’n, 799 F.2d 1572 (Fed.Cir.1986), that “the purpose of section 337 from its inception was to provide .relief to United States industry from unfair acts, including infringement of United States patents by goods manufactured abroad.” Id. at 1580.
Congress again considered Section 337 during the process of enacting the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100-418 § 1341, 102 Stat. 1107, stating that:
As indicated by the scope of its language, section 337 was intended to cover a broad range of unfair acts not then covered by other unfair import laws. However, over the years, patent, copyright, and trademark infringement were recognized as unfair trade practices within the meaning of section 337, and today section 337 is predominantly used to enforce U.S. intellectual property rights.
S.Rep. No. 100-71 (1987) at 130. The Act itself reiterated the purpose to provide “a more effective remedy for the protection of United States intellectual property rights” through exclusion of infringing imports. Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100-418 § 1341(b), 102 Stat. 1107,1212.
This court recently reaffirmed that “the legislative history consistently evidences Congressional intent to vest the Commission with broad enforcement authority to remedy unfair trade acts.” Suprema, Inc. v. Int’l Trade Comm’n, 796 F.3d 1338, 1350 (Fed.Cir.2015) (en banc).
The purpose of Section 337 to provide a facilitated remedy against infringing imports is beyond dispute. The panel majority’s removal of this remedy from a preeminent form of today’s technology is a dramatic withdrawal of existing rights, devoid of statutory support and of far-reaching impact. The majority’s ruling, that digital goods cannot be excluded under Section 337 because digital goods are “intangible,” is incorrect.

The Commission correctly held that Section 337 is not limited to the kinds of technology that existed in 1922 or 1930.

Patents are for things that did not previously exist, including kinds of technology that were not previously known. The panel majority, rejecting today’s digital technologies and overruling the International Trade Commission, holds that Section 337 does not apply to digital technology forms that the majority describes as “intangible.” It is not disputed that digital information, such as the data sets and models here imported, is patentable subject matter and can be infringing subject matter. There is no basis for excluding imported infringing subject matter from Section 337, whatever the form of the subject matter. '
The Supreme Court in Fortnightly Corp. v. United Artists Television, Inc., 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), considered “a statute that was drafted long before the development of the electronic phenomena with which we deal here,” stating that “[w]e must read the statutory language ... in the light of drastic technological change.” Id. at 395-96, 88 S.Ct. 2084. This rule aptly applies to the Tariff Acts of 1922 and 1930.
The Court has referred to adaptation of the copyright statute to new technologies, observing in Twentieth Century Music Corp. v. Aiken, 422 U.S., 151, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975), that although Congress did not revise the Copyright Act of 1909 following the advent of radio (and television), “copyright law was quick to *1307 adapt to prevent the exploitation of protected works through the new electronic technology.” Id. at 158, 95 S.Ct. 2040. The Court noted the “ultimate aim” of the copyright law “to stimulate artistic creativity for the general public good,” and stated that “[w]hen technological change has rendered its literal terms ambiguous, the Copyright Act must be construed in light of this basic purpose.” Id. at 156, 95 S.Ct. 2040.
The Commission has previously dealt with Section 337 importation in the form of digitally distributed software and digital files, stating that “[h]aving found that respondents’ software contributorily infringes the claims in issue, we are of the view that our remedial orders must reach that software.” Certain Hardware Logic Emulation Systems, Inv. No. 337-TA-383, USITC Pub. 3089, at 18 (March 1998). The court’s ruling today contravenes Commission precedent, as well as our own.
The Federal Circuit dealt with the nature of digital files in Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1321 (Fed. Cir.2009). The court rejected the argument that digital files such as computer software are not a “material or apparatus” subject to infringement as set forth in the Patent Act at 35 U.S.C. § 271(c). This reasoning applies to the “articles” subject to infringement as set forth in the Tariff Act at 19 U.S.C. § 1337. The court’s decision today is a distortion of the statute’s language and purpose, for Section 337 is designed to cover infringing subject matter; and digital software, as noted in Lu-cent, can be infringing subject matter.
Until today, Section 337 applied to all patented technologies, including digital technologies, whatever the path of importation. The court’s exclusion of digital products and data technologies imported by electronic transmission has no support in statute, precedent, or policy.

The Commission correctly held that “articles” in the Tariff Act means “articles of commerce.”

The Commission held that the term “articles” in the Tariff Act is intended to include all infringing imported “articles of commerce.” The Commission stated that “the statutory construction of ‘articles’ that hews most closely to the language of the statute and implements the avowed Congressional purpose for Section 337 encompasses within its scope the electronic transmission of the digital data sets at issue in this investigation.” Comm’n Op. at 36.
The panel majority holds that the term “articles” in the Tariff Act excludes imported digital articles, but in a different section, the Tariff Act definition of “article” is unchanged from the 1922 and 1930 statutes:
The term “article” includes any commodity, whether grown, produced, fabricated, manipulated, or manufactured.
19 U.S.C. § 1332(e)(1); Tariff Act of 1930, Part II, § 332, 46 Stat. 590, 699 (1930); Tariff Act of 1922, Part II, § 318(b), 42 Stat. 858, 947 (1922). This definition is striking in its breadth, and is commensurate with the stated purpose to reach “every type and form of unfair practice,” see Senate Rep. No. 67-595, supra.
Digital articles of commerce did not exist when the Tariff Act was first enacted. However, the intention to omit unforeseen, later-discovered technologies cannot be imputed to this statute, and is negated by the all-inclusive breadth of the definition that was written.
Nonetheless, the panel majority rules that the digital data sets and digital models that are here, imported are not “material things” and therefore are excluded from Section 337. Maj. Op. at 1297. Citing definitions in dictionaries of the 1920s, the *1308 majority rules that digital goods are “intangible,” and that infringing imports when electronically transmitted are excluded from the Tariff Act.
However, the Tariff Act did not lock Section 337 into the technology in existence in 1922 or 1930. It cannot have been the legislative intent to stop the statute with the forms of “article” then known. Further, the particles and waveforms of electronics and photonics and electromagnetism are not intangible, although not visible to the unaided eye.[1]
Section 337 was written in broad terms, whereby no field of invention, past, present, or future, was excluded. It is not reasonable to impute the legislative intent to exclude new fields of technology, and inventions not yet made, from a statute whose purpose is to support invention.
The court nonetheless imputes this legislative purpose to the Tariff Act, placing weight on selected definitions of “article” in dictionaries of the 1920s, while dismissing unselected definitions as “imprecise at best.” Maj. Op. at 1292. Thus the court arbitrarily rejects the definition in the leading dictionary of the era, Webster’s New International Dictionary of the English Language, 1924 Edition, and the 1934 Second Edition, which define “article” broadly and generally,' as “a thing of a particular class or kind as distinct from a thing of another class or kind; a commodity; as, an article of merchandise.” Merchandise, in turn, is defined as “the objects of commerce; whatever is usually bought and sold in trade; wares; goods.”
Precedent has long recognized that “article” in the Tariff Act was intended to be all-encompassing. The Court of Customs and Patent Appeals in 1940, citing Webster’s New International Dictionary, explained that, in the Tariff Act of 1930, “Congress said: ‘and paid upon all articles when imported from any foreign country.’ Unquestionably, Congress meant, by employing that language, to include under the word ‘articles’ any provided-for substance, material or thing of whatever kind or character that was imported into this country.” United States v. Eimer & Amend, 28 C.C.P.A. 10, 12, 1940 WL 4014 (1940).
The Commission defined “articles” in Section 337 to encompass “articles of commerce.” Comm’n Op. at 40. The Supreme Court defined “articles of commerce” to include pure information, holding in Reno v. Condon, 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000), that the Commerce Clause applies to interstate transmission of information in motor vehicle records sold or released “into the interstate stream of business.” Id. at 148, 120 S.Ct. 666.
Although data sets carrying information, imported by electronic or photonic or electromagnetic transmission, are not mentioned in the dictionaries of the 1920s, no reason has been shown to exclude them from articles of commerce. No dictionary, and no statutory constraint, limits “articles” to items that are grossly “tangible.” Data carried by electronic particles or waves constitute articles of commerce, and may be imported, bought and sold, transmitted, and used.
My colleagues’ removal of digital goods from the Tariff Act is devoid of definitional or statutory support. The Commission correctly defined “articles” in Section 337 as meaning articles of commerce, including digital articles and electronic commerce.

*1309
The Commission correctly held that importation of infringing articles is not restricted to specific kinds of carriers or modes of entry.

It is not disputed that the digital data sets and digital models of teeth are imported. Importation subject to Section 337 does not depend on the mode of entry into the territory of the United States:
Importation ... consists in bringing an article into a country from the outside. If there be an actual bringing in it is importation regardless of the mode in which it is effected. Entry through a customs house is not of the essence of the act.
Cunard S.S. Co. v. Mellon, 262 U.S. 100, 122, 43 S.Ct. 504, 67 L.Ed. 894 (1923).
The Bureau of Customs and Border Protection has established that Internet transmission is “importation” into the United States. See HQ 114459 (Sept. 17, 1998) (“We further find that the transmission of software modules and products to the United States from a foreign country via the Internet is an importation of merchandise into the customs territory of the United States”). The Customs rulings reflect the accepted view that digital products are “articles of commerce,” “goods,” or “merchandise.”
The Customs statute classifies software as “merchandise” under 19 U.S.C. § 1401(c). See HQ114459 (“we find that the subject software modules and products are ‘merchandise’ and ‘goods’ ... ”); see also Heading 8523, USHTS (2015) (Rev.2) (classifying software for importation duties). Although the panel majority argues that the Tariff Schedule exempts telecommunications transmissions from import duties, see General Note 3(e)(ii), HTSUS (2015) (Rev.2), it is established that telecommunications transmissions, including electronically imported software, are within the purview of the Customs service. The Court of International Trade stated in Former Employees of Computer Sciences Corp. v. U.S. Secretary of Labor, 30 Ct. Int’l. Tr. 124, 414 F.Supp.2d 1334 (2006):
General Note 3(e) supports the conclusion that telecommunications transmissions, which would include transmissions of software code via the Internet, are-exempt from duty while acknowledging that they are goods entering into the Customs boundaries of the United States.
Id. at 131, 414 F.Supp.2d 1334.
Exemption from import duty is not exemption from patent infringement. The court now discards established protocols and practices concerning electronic and digital technologies, although it is beyond debate that digital articles are “goods” or “merchandise” and may be bought and sold and patented and imported. Today’s ruling discards the Tariff Act’s purpose of protecting domestic industry from unfair trade in the importation of this vast and powerful body of commercial articles that may infringe United States patents.

The Commission correctly held that electronic importation of digital goods is subject to the trade laws.

My colleagues on this panel do not dispute that the Patent Act applies to the subject matter that is imported, although they hold that the Tariff Act does not apply, thereby rendering Section 337 incapable of performing its statutory purpose.
Section 337 does not distinguish between digital goods imported electronically and digital goods imported as embedded in a physical medium. My colleagues hold that importation of infringing digital data can be excluded when the data are carried on discs or other storage media, but cannot be excluded when carried in packets or *1310 waves by wired or wireless transmission. This distinction has long been discarded as unjustifiable, and in the context of Section 337 and other Trade statutes and rulings, precedent is universally contrary.
The Commission explained in Hardware Logic Emulation Systems, swpra, that “it would be anomalous for the Commission to be able to stop the transfer of a CD-ROM or diskette containing respondents’ software, but not be able to stop the transfer of that very same software when transmitted in machine readable form by electronic means.” Id. at 29.
Reaching the same logical conclusion, the Department of Labor, interpreting the Trade Act for purposes of Trade Adjustment Assistance, stated that “[sjoftware and similar intangible goods that would have been considered articles, for the purposes of the Trade Act, if embodied in a physical medium will now be considered to be articles regardless of their method of transfer.” IBM Corporation Global Services Division, Piscataway, NJ; Middle-town, NJ; Notice of Revised Determination on Remand, 71 FR 29183-01 (May 19, 2006). And as mentioned supra, the Customs service holds that “[t]he fact that the importation of the merchandise via the Internet is not effected by a more ‘traditional vehicle’ (e.g., transported on a vessel) does not influence our determination.” HQ 114459 at 2.
To further illustrate, Congress rejected the distinction the court creates, in the context of trade negotiations. The recently enacted Bipartisan Congressional Trade Priorities and Accountability Act of 2015 covers “digital trade in goods and services” and states that “[t]he principal negotiating objectives of the United States ... are ... to ensure that electronically delivered goods and services receive no less favorable treatment under trade rules and commitments than like products delivered in physical form.” Pub L. No. 114-26, § 102(a)(6) and (a)(6)(B)(i), 129 Stat. 320, 325 (2015).
Although various forms of wired and wireless transmission have become commonplace, within nations and across borders, the panel majority has locked the International Trade Commission into technological antiquity. The court ignores precedent and logic, and removes a vast body of technology from the protection of a statute designed for its protection.

Difficulty of enforcement is not grounds for discarding a remedial statute.

The court argues that violation of Section 337 by electronic transmission into the United States, such as via the Internet or other cloud technologies, may be difficult to track and enforce. This argument, whatever the present state of science, cannot apply to the facts of this case, for the electronically imported digital goods are produced by the Pakistani affiliate of the United States importer, who is subject to the Commission’s Cease-and-Desist Order.
Cease-and-desist orders as a remedy for Section 337 violations are not new, including orders relating to infringement by digital importation. See Hardware Logic Emulation Systems, supra, at 3 (ordering that respondent “shall not ... import (including electronically) into the United States, or use, duplicate, transfer, or distribute by electronic means or otherwise, within the United States, hardware logic emulation software that constitutes covered product”).
Even if enforcement were difficult, difficulty of enforcing a remedial statute is not grounds for judicial elimination of all remedy. See Bally/Midway Mfg. Co. v. Int’l Trade Comm’n, 714 F.2d 1117, 1122 (Fed. Cir.1983) (rejecting the position. that absence of remedy precludes a finding of *1311 violation of Section 337). The court stated that “Congress did not intend the Commission to consider questions of remedy when the agency determines whether there is a violation.” Id. at 1123.
My colleagues’ reliance on possible difficulty of enforcement against electronic transmission of infringing digital data and related articles, although not at issue in this case, merely adds imprecision to judicial guidance in this commercially important area.

The Commission’s ruling requires judicial deference in accordance with Chevron.

It is not disputed that the digital data sets and digital models for teeth alignment, produced in Pakistan and-imported into the United States, infringe the patents of Align Technology. The Commission recognized that this technology is subject to Section 337. This ruling is a reasonable statutory interpretation.
If Section 337 were deemed ambiguous as applied to these fields of technology and commerce, the Commission’s well-reasoned interpretation, amid extensive corroboratory rulings, is entitled to judicial deference. “[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency’s answer is based on a permissible construction of the statute.” Chevron U.S.A Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). A permissible construction is one that is “rational and consistent with the statute.” Sullivan v. Everhart, 494 U.S. 83, 88-89, 110 S.Ct. 960, 108 L.Ed.2d 72 (1990) (quoting N.L.R.B. v. United Food & Commercial Workers Union, Local 23, AFL-CIO, 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987)). “If the agency interpretation is not in conflict with the plain language of the statute, deference is due.” Nat’l R.R. Passenger Corp. v. Boston & Maine Corp., 503 U.S. 407, 417, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992).
The rule of deference to the Commission’s reasonable statutory interpretation has long been recognized by the Federal Circuit. E.g., TianRui Grp. Co. v. Int’l Trade Comm’n, 661 F.3d 1322, 1332 (Fed.Cir.2011) (“We have held that the Commission’s reasonable interpretations of section 337 are entitled to deference.”); Kinik Co. v. Int’l Trade Comm’n., 362 F.3d 1359, 1363 (Fed.Cir.2004) (“To the extent that there is any uncertainty or ambiguity in the interpretation of § 337(a) and its successor § 1337(a)(l)(B)(ii), deference must be given to the view of the agency that is charged with its administration.”); Enercon GmbH v. Int’l Trade Comm’n, 151 F.3d 1376, 1381 (Fed.Cir.1998) (“As the agency charged with the administration of section 337, the ITC is entitled to appropriate deference to its interpretation of the statute.”).
“Congress cannot, and need not, draft a statute which anticipates and provides for all possible circumstances in which a general policy must be applied to a specific set of facts. It properly leaves this task to the authorized agency.” Micron Tech., Inc. v. United States, 243 F.3d 1301, 1312 (Fed. Cir.2001). To the extent that new technologies are involved in these infringing importations, deference is appropriate to the agency’s reasonable application of the statute it is charged to administer. See Nat’l Cable & Telecommunications Ass’n, Inc. v. Gulf Power Co., 534 U.S. 327, 339, 122 S.Ct. 782, 151 L.Ed.2d 794 (upholding agency interpretive authority where the statute involved “technical, complex, and dynamic”, subject matter that “might be expected to evolve in directions Congress knew it could not anticipate.”).
On any standard, the Commission’s determination is reasonable, and warrants *1312 respect. The panel majority’s contrary ruling is not reasonable, on any standard.
Conclusion
The Commission’s ruling is consistent with the language, structure, and purpose of Section 337,' and decades of precedent concerned with digital data, electronic transmission, and infringing importation. From the court’s erroneous departure from statute and precedent, I respectfully dissent.

. It is reported that the elusive Higgs boson, a fundamental particle of matter, has been detected by observing its effects. By the same laws of physics, digital matter is most readily observed in its effects. The panel majority’s ruling that such matter is not "material” is contrary to the law of the courts, the Customs agency, and the Commission.